IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID L. WICKLINE,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED MICRONESIA DEVELOPMENT ASSOCIATION, INC.,<br><br>    Defendant. | No. C 14-00192 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND TRANSFERRING THE ACTION TO THE DISTRICT COURT FOR THE NORTHERN MARIANA ISLANDS** |

Presently before the Court is a motion by defendant United Micronesia Development Association, Inc. ("UMDA") (1) to dismiss plaintiff David L. Wickline's complaint for lack of personal jurisdiction; (2) to transfer the action under 28 U.S.C. § 1406; or, in the alternative, (3) to stay the action. Docket No. 35. For the reasons set forth below, the Court GRANTS UMDA's motion to dismiss for lack of personal jurisdiction and TRANSFERS the action to the District Court for the Northern Mariana Islands.

**BACKGROUND**

UMDA is a corporation organized under the laws of the Commonwealth of the Northern Mariana Islands ("CNMI") with its principal place of business in Saipan, CNMI. Docket No. 26, First Amended Complaint ("FAC") ¶ 2; Docket No. 35-1, Lifoifoi Decl. ¶ 3. UMDA's business is focused on making passive investments in real estate and various businesses—including airlines, cable systems, and resort

properties—located in Micronesia. Docket No. 35-1, Lifoifoi Decl. ¶ 3; Docket No. 35-4, Mafnas Decl. ¶ 4.

UMDA does not do business in California or solicit any business in California. Docket No. 35-4, Mafnas Decl. ¶ 4. UMDA does not have any customers or clients in California. *Id.* UMDA is not authorized to do business in California. *Id.* UMDA does not own any real property in California and has never done so. *Id.* ¶ 5. UMDA does not have any bank accounts in California and has never had an office in California. *Id.* ¶ 6. Finally, UMDA has never derived income from California activities or owed or paid taxes in California. *Id.* ¶ 7.

Since 2000, Wickline has resided and maintained his principal office in Occidental, California. Docket No. 45-1, Wickline Decl. ¶ 2. In the fall of 2007, UMDA's board of directors appointed Wickline to fill a vacant position as a member of its board of directors. Docket No. 35-1, Lifoifoi Decl. ¶ 4. Wickline was appointed to the position "based on his impressive financial background as well as his extensive business experience in Micronesia." *Id.*; FAC ¶ 7.

On October 7, 2009, by unanimous consent of UMDA's board of directors, UMDA hired Wickline as an employee, and on November 17, 2009, at a meeting of the board of directors, UMDA named him president and chief executive officer ("CEO"). Docket No. 35-1, Lifoifoi Decl. ¶ 5. The board of directors deemed Wickline qualified to serve as president and CEO in part "because of his extensive business experience in Micronesia and his relationship with local business leaders and politicians." *Id.* No UMDA representative traveled to California to negotiate with Wickline or offer a position to Wickline. *Id.* But, at the time they hired Wickline, UMDA's board of directors knew that Wickline was a California resident. Docket No. 45-1, Wickline Decl. ¶ 2. Wickline accepted employment from UMDA on the express condition that he would not be required to relocate to Saipan.[1]

---

[1] Although Wickline did not relocate from California to Saipan, he signed various documents related to his employment with UMDA listing a Saipan address as his home address, including his W-4 tax form and his enrollment application for medical insurance. Docket No. 35-4, Mafnas ¶ 11, Ex. 1; Docket No. 47-3, Mafnas Decl. ¶ 5, Ex. 1. In addition, at various times during his employment, UMDA provided Wickline with an Executive Suite in the Palms Resort hotel located in Saipan for his exclusive use, allowed Wickline to stay in a condominium UMDA owned in Saipan, and reimbursed Wickline for his hotel costs when he stayed in Saipan. Docket No. 35-4, Manfas Decl. ¶ 15; Docket No. 45-1, Wickline Decl. ¶ 4.

*Id.* ¶ 3. Wickline alleges that as UMDA's CEO, he was to receive the same compensation package as the prior president and CEO, which included an annual salary of $300,000, a monthly housing allowance, complete medical and dental benefits, long-term disability insurance, and severance. FAC ¶¶ 8-9. In addition, Wickline alleges that he accepted the employment on the condition that UMDA would negotiate and agree no later than at the end of 2009 to additional performance-based compensation.[2] *Id.* ¶ 8.

Wickline's responsibilities as CEO included supervising UMDA's employees, all of whom resided in CNMI; managing UMDA's existing business interests in Micronesia; helping to identify new investment opportunities in Micronesia; and attending meetings of the UMDA board of directors. Docket No. 35-1, Lifoifoi Decl. ¶ 7. As an employee of UMDA, Wickline performed some of his duties in California and some of his duties in Saipan. Docket No. 45-1, Wickline Decl. ¶¶ 3-4; Docket No. 35-4, Mafnas Decl. ¶¶ 17-18. During his employment, UMDA paid for his California telephone and cell phones. Docket No. 45-1, Wickline ¶ 3. In addition, Wickline maintained a bank account in Saipan to receive his salary from UMDA. *Id.* ¶ 4; Docket No. 35-4, Mafnas ¶ 12. UMDA withheld the applicable CNMI "Wage & Salary" taxes from Wickline's salary and paid these taxes to the CNMI Department of Finance–Revenue and Taxation. Docket No. 35-4, Mafnas ¶ 12, Ex. 2; Docket No. 47-3, Mafnas Decl ¶ 7.

Wickline alleges that at the time he became CEO, UMDA was nearly insolvent, and its principal asset, the Palms Resort hotel, was badly in need of renovation and was experiencing operating losses of more than $3,000,000 a year. FAC ¶ 10. On April 12, 2010, after Wickline had obtained temporary funding for UMDA's most urgent needs, he requested that UMDA honor its commitment to negotiate his performance-based compensation. *Id.* On October 1, 2010, at a board meeting, plaintiff alleges that the board advised him that it had agreed that he be granted options to purchase 150,000 shares of UMDA stock at $5.00 a share. *Id.* ¶ 13. Wickline alleges that under the terms of the grant, an option to purchase 50,000 shares of UMDA stock vested immediately, an additional option to purchase 50,000

---

[2] Wickline alleges that the parties drafted a formal written employment contract memorializing the agreement, but that the draft was never finalized and signed by the parties. FAC ¶ 9.

3

1  shares would vest when UMDA secured recapitalization and renovation funding for the Palms Resort
2  hotel, and an additional option to purchase 50,000 shares would vest upon the opening of the renovated
3  hotel. *Id.* ¶¶ 13, 15.

4  Wickline alleges that through his efforts UMDA was able to sell the Palms Resort hotel in
5  August 2011 for $20,000,000 rather than at a distressed sale-price, which likely would have been in the
6  range of $4,000,000. FAC ¶¶ 16-17. Plaintiff alleges that as a result of the sale, UMDA's stock value
7  increased from between $2 and $3 per share to $45 per share. *Id.* ¶ 17.

8  In 2011 or 2012, Wickline began negotiating on behalf of UMDA with United Airlines, Inc. for
9  the extension of UMDA's United airline travel passes ("the United Passes"), which were scheduled to
10 expire on December 31, 2011.[3] FAC ¶ 18; Docket No. 45-1, Wickline Decl. ¶ 7; Docket No. 35-2,
11 O'Connor Decl. ¶¶ 3-10. Plaintiff alleges that in July 2012 at a meeting of the board of directors, one
12 of UMDA's directors, Jose Lifoifoi, told Wickline that he was no longer needed and demanded that he
13 resign from his positions as CEO and director. *Id.* ¶ 19. Wickline alleges that at this meeting, the board
14 of directors determined that he was to remain employed by UMDA as a consultant with the nominal title
15 of CEO but with no salary until three conditions were met: (1) UMDA paid Wickline all of his earned
16 but deferred compensation, which was to be determined in good faith; (2) Wickline would continue to
17 represent UMDA in its negotiations with United regarding the airline passes and, in exchange, Wickline
18 would receive continued use of his United Pass for the full term of whatever extension UMDA could
19 secure; and (3) Wickline would assist UMDA in the prosecution of claims before the Financial Industry
20 Regulatory Authority ("FINRA") in Hawaii in exchange for compensation to be negotiated in good
21 faith. FAC ¶ 20-21; Docket No. 45-1, Wickline Decl. ¶ 6.

22 Wickline alleges that with this new agreement in place, he continued negotiations with United
23 and obtained an extension of the passes until December 31, 2018, and in exchange UMDA assigned him
24 one of the new extended passes. FAC ¶ 21. Wickline alleges that UMDA also paid him his deferred
25 salary portion of his earned compensation. *Id.* ¶ 22. But, when Wickline attempted to exercise his stock

---

[3] The United Passes entitle the holders of the passes to unlimited, First-Class travel on United's operated global routes. FAC ¶ 18.

options for 150,000 shares of stock, the board refused to accept his tender and issue the certificates. *Id.* Wickline alleges that this consultant position as UMDA's nominal CEO ended around February 2013. *Id.* ¶ 1.

Wickline remained on the board of directors of UMDA until August 2013. FAC ¶¶ 1, 23. After August 2013, Wickline held the position of UMDA's Business Development Officer—a consultant position with no salary but entitling Wickline to retain his United Pass—while negotiations over Wickline's remaining earned compensation continued. *Id.*; Docket No. 45-1, Wickline Decl. ¶ 7. On January 13, 2014, after a failed mediation, UMDA terminated Wickline and terminated his United Pass. FAC ¶ 23; Docket No. 45-1, Wickline Decl. Ex. D; Docket No. 35-3, Torres Decl. ¶¶ 8-9.

On January 13, 2014, UMDA also filed a complaint against Wickline in the Superior Court of the Commonwealth of the Northern Mariana Islands ("the CNMI action"), alleging claims for: (1) declaratory relief; (2) fraud; (3) breach of fiduciary duty; (4) unjust enrichment; (5) injunctive relief; and (6) wrongful dilution under 4 CMC § 4106. Docket No. 35-3, Torres Decl. Ex. 2. In the complaint, UMDA alleges that Wickline used his position as an officer and director of UMDA to carry out a fraudulent scheme against UMDA to obtain options to purchase 150,000 shares of UMDA stock. *Id.* at 1. On February 3, 2014, Wickline removed the action pursuant to 28 U.S.C. § 1441 to the District Court for the Northern Mariana Islands. *Id.* Ex. 4. On April 29, 2014, after Wickline filed a motion to dismiss the complaint, UMDA filed a first amended complaint. *Id.* Ex. 6. The district court in the CNMI action has scheduled a trial date for August 3, 2015. Docket No. 50-1.

On January 13, 2014, the same calendar day as but 24 hours later than the filing of the CNMI action, plaintiff filed the present action in the Northern District of California against UMDA. Docket No. 1, Compl. On March 4, 2014, UMDA filed a motion to dismiss the complaint for lack of personal jurisdiction. Docket No. 12. On April 4, 2014, plaintiff filed a first amended complaint ("FAC"), mooting UMDA's prior motion to dismiss. Docket No. 26, FAC. In the FAC, plaintiff alleges causes of action for: (1) fraud; (2) breach of contract - stock options; (3) promissory estoppel; (4) breach of contract - wages; (5) breach of contract - United pass; (6) conversion; (7) violation of California Labor Code §§ 201, 202; and (8) breach of contract to negotiate in good faith. *Id.* ¶¶ 24-67.

By the present motion, UMDA moves (1) to dismiss the action for lack of personal jurisdiction; (2) to transfer the action under 28 U.S.C. § 1406 to the District Court for the Northern Mariana Islands; or, in the alternative, (3) to stay the action until the conclusion of the CNMI action. Docket No. 35, Def.'s Mot.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction. "The plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010). "Where, as here, a motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* "Uncontroverted allegations in the complaint must be taken as true, and conflicts over statements contained in affidavits must be resolved in [plaintiff's] favor." *Id.*; *accord Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003).

Where there is no federal statute applicable to determine personal jurisdiction, a district court should apply the law of the state where the court sits. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). California's long-arm statute only requires that the exercise of personal jurisdiction comply with federal due process requirements. *Id.* at 800-01 ("Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same.").

For a court to exercise personal jurisdiction over a nonresident defendant, due process requires that the defendant has either a continuous and systematic presence in the state (general jurisdiction), or minimum contacts with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice" (specific jurisdiction). *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted); *see also Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001) ("Applying the 'minimum contacts' analysis, a court may obtain either general or specific jurisdiction

6

over a defendant."). Here, Wickline asserts that the Court has personal jurisdiction over UMDA because UMDA is subject to specific jurisdiction in California. Docket No. 42, Pl.'s Opp'n at 5.

In order for a court to exert specific jurisdiction in accordance with due process, a nonresident defendant must have "'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Int'l Shoe*, 326 U.S. at 315). The Ninth Circuit employs a three-part test to determine whether the defendant has such minimum contacts with a forum state.

> "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Schwarzenegger*, 374 F.3d at 802. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

"Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). However, under the doctrine of pendent personal jurisdiction, "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* Therefore, in a case such as this where all of plaintiff's claims arise out of a common nucleus of operative facts, if personal jurisdiction exists on one claim, the Court may exercise jurisdiction over all the other claims. *See Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012) ("If Washington has jurisdiction over this claim, it may exercise

jurisdiction over the remaining claims, which are related."); *NetApp, Inc. v. Nimble Storage*, No. 5:13-CV-05058-LHK (HRL), 2014 U.S. Dist. LEXIS 65818, at *22-23 (N.D. Cal. May 12, 2014).

**DISCUSSION**

**I.    Whether the Court Should Apply the Purposeful Availment Test or the Purposeful Direction Test**

Under the first prong of the specific jurisdiction test, plaintiff must establish that UMDA either purposefully availed itself of the privilege of conducting activities in California or purposefully directed its activities toward California. *See Schwarzenegger*, 374 F.3d at 802. The Ninth Circuit "often use the phrase 'purposeful availment,' in shorthand fashion, to include both purposeful availment and purposeful direction, but availment and direction are, in fact, two distinct concepts." *Id.* (citations omitted). Purposeful availment analysis is most often used for claims sounding in contract, and purposeful direction is most often used for claims sounding in tort. *Id.*

Here, plaintiff alleges claims against UMDA sounding in both contract and tort. *See generally* Compl. In its motion, UMDA argues that although the complaint alleges both contract and tort claims, the Court should apply only the purposeful availment test because the case primarily sounds in contract and all of plaintiff's tort claims are premised on his alleged contractual relationship with UMDA. Def.'s Mot. at 9-12. In response, plaintiff argues that he should be able to rely on either the purposeful availment test or the purposeful direction test because the complaint includes claims for fraud and conversion that do not arise out of his contract claims. Docket No. 42, Pl.'s Opp'n at 6-8.

In several decisions, the Ninth Circuit has applied the purposeful availment test to suits that involve both contract and tort claims where the tort claims arise out of the plaintiff's contractual relationship with the defendant. For example, in *Sher v. Johnson*, 911 F.2d 1357, 1362-64 (9th Cir. 1990), the Ninth Circuit applied a purposeful availment analysis to a complaint alleging both contract and tort claims in a legal malpractice suit. The court stated: "Although some of [plaintiff]'s claims sound in tort, all arise out of [plaintiff]'s contractual relationship with the defendants." *Id.* at 1362. Next, in *Boschetto v. Hansing*, 539 F.3d 1011, 1016-19 (9th Cir. 2008), the Ninth Circuit applied the purposeful availment analysis to a complaint that contained four state law causes of action for breach

8

of contract, misrepresentation, fraud, and violation of the California Consumer Protection Act, stating that the plaintiff's case sounded "primarily in contract." Finally, in *HK China Grp. v. Beijing United Auto. & Motorcycle Mfg. Corp.*, 417 F. App'x 664, 665-66 (9th Cir. 2011), the Ninth Circuit applied the purposeful availment test to a complaint that included claims for breach of contract and fraud. The court explained "when the alleged fraud is merely the representations in the contract that gave rise to the breach[,]" then the action sounds primarily in contract. *Id.* at 665; *see also, e.g.*, *Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C 12-06458 SI, 2013 U.S. Dist. LEXIS 68563, at *8-13 (N.D. Cal. May 13, 2013) (applying the purposeful availment test to a complaint that included six tort claims because "all of the tort claims ar[o]se out of [plaintiff]'s contractual relationship with defendants.").

Here, Wickline argues that the Court should apply the purposeful direction test based on the presence of two tort claims in the first amended complaint—his claim for fraud and his claim for conversion. Pl.'s Opp'n at 6-8. In the first amended complaint, Wickline alleges that UMDA is liable for fraud based on UMDA's false representation that Wickline would have options to purchase 150,000 shares of UMDA stock and his reliance on that representation in continuing to work for UMDA as its CEO. FAC ¶¶ 24-29. Here, "the alleged fraud is merely the representations in the contract that gave rise to the breach." *HK China Grp.*, 417 F. App'x at 665; *see* FAC ¶¶ 30-35 (alleging claim for breach of contract based on UMDA's refusal to honor Wickline's tender of $750,000 and issue him stock certificates representing 150,000 shares of UMDA stock). Therefore, Wickline's fraud claim sounds primarily in contract.

Turning to plaintiff's conversion claim, Wickline alleges that UMDA is liable for conversion because it has wrongfully dispossessed him of his United Pass by terminating him as an officer of UMDA. FAC ¶¶ 52-57. In the FAC, plaintiff alleges that he was entitled to the United Pass based on the agreement reached at the July 2012 board meeting providing that Wickline would continue to represent UMDA in its negotiations with United regarding the extension of the passes in exchange for Wickline retaining his United Pass for the full term of the obtained extension, and Wickline's performance under the alleged agreement. FAC ¶¶ 20-21. Therefore, Wickline's conversion claim

1 arises out of his contractual relationship with UMDA.[4] *See* FAC ¶¶ 46-51 (alleging claim for breach
2 of contract based on UMDA terminating him as an officer and thereby depriving him of his United
3 Pass). In sum, the Court concludes that Wickline's action sounds primarily in contract, and, therefore,
4 for him to meet his burden of establishing that the Court has specific, personal jurisdiction over UMDA,
5 he must satisfy the purposeful availment test. *See Boschetto*, 539 F.3d at 1016; *Sher*, 911 F.2d at 1362.

## II.     Whether Plaintiff Has Satisfied the Purposeful Availment Test

The purposeful availment test requires that "'in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "A defendant has purposely availed himself of the benefits of a forum if he has deliberately 'engaged in significant activities within a State or has created "continuing obligations" between himself and the residents of the forum.'" *Id.* (quoting *Burger King*, 471 U.S. at 475-76). Further, "[p]urposeful availment requires that the defendant engage in some form of affirmative conduct allowing or promoting the transaction of business within the forum state.'" *Gray & Co. v. Firstenberg Machinery Co.*, 913 F.2d 758, 760 (9th Cir. 1990); *accord Boschetto*, 539 F.3d at 1016. This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person. *Burger King*, 471 U.S. at 475 ("'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'").

---

[4] In his opposition, Wickline relies on this Court's prior decision in *PSI Seminars v. LB Seminars for Life Success & Leadership*, No. C 12-04711 SI, 2013 U.S. Dist. LEXIS 15020 (N.D. Cal. Feb. 1, 2013) to argue that the purposeful direction test should be used. Pl.'s Opp'n at 7. Relying on this case, Wickline argues that the purposeful availment test should not be applied when the tort is committed after the parties' contractual relationship has concluded. *Id.* However, Wickline's reliance on *PSI Seminars* is unpersuasive because in that case both sides had analyzed the question using the purposeful direction test; neither had urged use of the purposeful availment test. *See* Docket No. 47-1, Ex. 2 at 10-16, Ex. 3 at 5-9. Moreover, even under plaintiff's assertion of the law, application of the purposeful availment test here would still be proper. Plaintiff's conversion claim is based on his allegations that under the relevant agreement, UMDA had a continuing obligation to provide him with his United Pass until December 31, 2018. FAC ¶¶ 20-21, 47. Plaintiff alleges that defendant's conversion of his United Pass occurred on January 13, 2014. *Id.* ¶ 54. Therefore, under plaintiff's allegations, at the time the tort allegedly occurred, the contractual relationship between himself and UMDA had not concluded.

10

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. But, "the formation of a contract with a nonresident defendant is not, standing alone, sufficient to create jurisdiction." *Boschetto*, 539 F.3d at 1017; *accord Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). In determining whether there was a purposeful availment based on a contract, the Court "must look to 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine if the defendant's contacts are 'substantial' and not merely 'random, fortuitous, or attenuated.'" *Sher*, 911 F.2d at 1362 (quoting *Burger King*, 471 U.S. at 479, 480).

After reviewing the record in this case, the Court concludes that Wickline has failed to establish that UMDA purposefully availed itself of the privilege of conducting activities in California. In performing the purposeful availment analysis in this case, the Court finds particularly instructive the Ninth Circuit's decision in *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (1988). In *McGlinchy*, the Ninth Circuit found no purposeful availment of California law where the plaintiff and defendant entered into a contract that was executed by the plaintiff in California and the majority of plaintiff's performance under the contract occurred in California. *See id.* at 816-17. The Ninth Circuit explained that although the contract was executed by plaintiff in California, it was negotiated in England. *Id.* at 816. Therefore, "'the substance of the relationship was formed' in England, [and] the formality of signing the contract in California cannot establish jurisdiction." *Id.* The Ninth Circuit further explained that no authorized agents of the defendant "were alleged to have performed or executed any portion of the contract in California." *Id.* The Ninth Circuit also explained that "the contract makes no reference to California or to the United States, either as appellants' place of residence or as a forum for dispute settlement.'" *Id.* As to plaintiff's performance under the contract, the court noted that the plaintiff's allegations that it performed 90% of its activities in California and that it invited defendant to use its California facilities, "even if accurate, describes only unilateral activity." *Id.* Such unilateral activity is insufficient to confer personal jurisdiction over the defendant. *Id.*

11

The Court also find instructive the Ninth Circuit's decision in *Slepian v. Guerin*, No. 98-35039, 1999 U.S. App. LEXIS 3371 (9th Cir. Mar. 1, 1999). In *Slepian*, the Ninth Circuit found no purposeful availment of Oregon law where the defendant, a California company that did not conduct any business activities in Oregon, entered into an employment agreement with the plaintiff, an Oregon resident. *See id.* at *4-8. The Ninth Circuit first noted that the plaintiff had initiated contact with the defendant by sending her resume to defendant's headquarters in California and interviewing for the position in California. *Id.* at *5. The Ninth Circuit further noted "that [plaintiff]'s 'employment contract was negotiated in California and performed by [defendant] in California and by [plaintiff] nationwide.' [Plaintiff]'s services for [defendant] were never directed at Oregon residents or Oregon businesses." *Id.* at *6. Finally, the Court explained that "[plaintiff]'s presence in Oregon and [defendant]'s accommodation of [plaintiff]'s choice of residence were not coupled with other contacts initiated by [defendant] and directed toward the forum." *Id.* at *7. Based on these facts, the Ninth Circuit concluded that the plaintiff had failed to establish that the defendant purposeful availed itself of the privilege of conducting activities in Oregon. *Id.* at *8.

Examining first the formation of the contracts, it is unclear from the record who pursued whom in initiating negotiations with respect to the initial employment agreement.[5] But, the record shows that all of the alleged agreements were entered into in Saipan during meetings of the board of directors. FAC ¶¶ 8, 13, 20; Docket No. 35-1, Lifoifoi Decl. ¶ 5. It also appears from the record that all the negotiations for these agreements occurred in Saipan at these board meetings, not in California. FAC ¶¶ 8, 10, 13, 20; Docket No. 35-1, Lifoifoi Decl. ¶ 5 ("No UMDA representative traveled to California to negotiate with Wickline or offer a position to Wickline."). Therefore, the substance of the contractual relationship was formed in Saipan, not California, and these facts weigh against a finding of purposeful availment. *See McGlinchy*, 845 F.2d at 816; *Slepian*, 1999 U.S. App. LEXIS 3371, at *5-6.

Turning to the contemplated future consequences of the contracts, plaintiff does not allege that any part of the contracts were performed by defendant in California. Plaintiff does not allege that any

---

[5] Regardless of who was in pursuit, the record shows that Wickline was hired because of his extensive experience in Micronesia and his relationships with local business leaders and politicians, not because of any relationship he had with California residents or California businesses. FAC ¶ 7; Docket No. 35-1, Lifoifoi Decl. ¶¶ 4, 5.

12

authorized agent of UMDA ever visited California in furtherance of UMDA's duties under the agreements. In addition, the Court notes that any salary payments made by UMDA to plaintiff under the agreements were to his bank account in Saipan. Docket No. 45-1, Wickline ¶ 4; Docket No. 35-4, Mafnas ¶ 12. Plaintiff states that at the time the initial contract was entered into UMDA knew that he was a California resident, and that he accepted the employment on the basis that he not be required to relocate to Saipan. Docket No. 45-1, Wickline ¶ 3. Plaintiff argues, therefore, that the contract contemplated that the majority his duties and obligations under the contract would be performed in California. Pl.'s Opp'n at 9. But, the fact that plaintiff performed the majority of his duties in California, his place of residence, through the use of a phone or email merely constitutes unilateral activity and is insufficient to establish purposeful availment. *See McGlinchy*, 845 F.2d at 816 ("'[Plaintiffs]' statement that it 'performed 90% of [its] activities in the Bay Area,' even if accurate, describes only unilateral activity."); *Slepian*, 1999 U.S. App. LEXIS 3371, at *6 ("[Plaintiff]'s use of phone, fax, and electronic mail to perform some of her job duties from home does not establish that [defendant] conducted sufficient activities in the forum." (citing *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985)). This unilateral activity is insufficient to establish a purposeful availment by UMDA. *See id.* Moreover, plaintiff does not allege that any of his duties or obligations under the contract were directed at California residents or California businesses. To the contrary, all of his activities under the agreements were directed towards Micronesia or Hawaii. As UMDA's CEO, Wickline's responsibilities consisted of supervising UMDA's employees, all of whom resided in CNMI; managing UMDA's existing business interests in Micronesia; helping to identify new investment opportunities in Micronesia; and attending meetings of the UMDA board of directors. Docket No. 35-1, Lifoifoi Decl. ¶ 7; Docket No. 45-1, Wickline Decl. ¶¶ 3-4. Further, Wickline's duties under the subsequent consultant agreement were to negotiate on behalf of UMDA with United Airlines for the extension of UMDA's United Passes, and to assist in the prosecution of claims before the FINRA in Hawaii. FAC ¶ 20; Docket No. 45-1, Wickline Decl. ¶ 4.

In addition, like the defendant in *Slepian*, UMDA does not conduct any business in California and has not conducted any business in California since it hired Wickline. *See* Docket No. 35-4, Mafnas Decl. ¶ 4; Docket No. 35-1, Lifoifoi Decl. ¶ 9. UMDA does not have any customers or clients in

California. Docket No. 35-4, Mafnas Decl. ¶ 4. UMDA is not authorized to do business in California, and UMDA has never derived income from California activities or owed or paid taxes in California. *Id.* ¶¶ 4, 7.

In his opposition, plaintiff, relying on the Ninth Circuit's decision in *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991), argues that there was a purposeful availment because the economic realities of the contracts is that UMDA engaged in a six-year business relationship with a California resident, who performed the majority of his duties in California. Pl.'s Opp'n at 9. The Court does not find plaintiff's reliance on *Roth* persuasive. *Roth* involved a contract between a California movie producer and a book author residing in Mexico, granting the producer the rights to make a movie based on one of the author's novels. 942 F.2d at 619. Although it was the movie producer who solicited the defendants, the defendants had never visited the forum state, and the movie would be filmed in Brazil, the Ninth Circuit found a purposeful availment based on the future consequences of the contract. *Id.* at 622. The Ninth Circuit explained: "The point here is simply that the contract concerned a film, most of the work for which would have been performed in California. Though the shooting most likely would have taken place in Brazil, all of the editing, production work, and advertising would have occurred in California." *Id.* Therefore, "most of the future of the contract would have centered on the forum[,]" and the "economic reality" was "that the contract's subject would have continuing and extensive involvement with the forum." *Id.* In relying on *Roth*, plaintiff focuses on where performance of the contract would occur. But, the place of performance is not dispositive of the issue in determining whether there was a purposeful availment. *See McGlinchy*, 845 F.2d at 816; *Peterson*, 771 F.2d at 1262; *Slepian*, 1999 U.S. App. LEXIS 3371, at *6. What distinguishes *Roth* from *McGlinchy* and *Slepian* is the results of the performance. In *Roth*, the parties' performance under the contract was directed at California businesses and California residents and promoted the transaction of business within California because all of the editing, production work, and advertising for the film would have occurred in California. *Cf. Gray*, 913 F.2d at 760 ("Purposeful availment requires that the defendant engage in some form of affirmative conduct allowing or promoting the transaction of business within the forum state.'"). In contrast, here, the parties' performance under the agreements was directed at Micronesia businesses and Micronesia residents, in addition to a FINRA action in Hawaii. FAC ¶ 20; Docket No.

14

35-1, Lifoifoi Decl. ¶ 7; Docket No. 45-1, Wickline Decl. ¶¶ 3-4. In no way did the parties' performance under the agreements allow for or promote the transaction of business within California. Therefore, the "economic reality" of the agreements was that the contracts' subject was activities in Micronesia, not in California.

In sum, plaintiff has failed to establish that UMDA purposeful availed itself of the privilege of conducting activities in California, and, therefore, has failed to establish that the Court has specific, personal jurisdiction over UMDA. Accordingly, the Court grants UMDA's motion to dismiss the action for lack of personal jurisdiction.

### III.   Whether to Transfer or Dismiss the Case

UMDA argues that if the Court concludes that it lacks personal jurisdiction over it, then it should dismiss the action or transfer the action under 28 U.S.C. § 1406 to the District Court for the Northern Mariana Islands. Def.'s Mot. at 23. Once a Court determines that it lacks personal jurisdiction, it may dismiss the case or, in the interest of justice, transfer the case under 28 U.S.C. § 1406(a). *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) ("The language of 28 U.S.C. § 1406(a) is amply broad enough to authorize the transfer of cases . . . whether the court in which it was filed had personal jurisdiction over the defendants or not."); *Nelson v. International Paint Co.*, 716 F.2d 640, 643 & n.4 (9th Cir. 1983). The Court finds that transfer is appropriate here. The District Court for the Northern Mariana Islands would have personal jurisdiction over UMDA, and there is already a related action between the parties pending before that court. Accordingly, the Court TRANSFERS the action to the District Court for the Northern Mariana Islands.

### CONCLUSION

For the foregoing reasons, the Court GRANTS UMDA's motion to dismiss for lack of personal jurisdiction and TRANSFERS the action to the District Court for the Northern Mariana Islands. Docket No. 35.

**IT IS SO ORDERED.**

Dated: June 30, 2014

SUSAN ILLSTON
United States District Judge